IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2026

## STATE OF TENNESSEE v. JOMO KENYATTA BERRY

**Appeal from the Criminal Court for Knox County**
**No. 123693   Hector Sanchez, Judge**

_____

### No. E2024-01902-CCA-R3-CD

_____

A Knox County jury convicted the defendant, Jomo Kenyatta Berry, of one count of attempted first-degree murder, two counts of employing a firearm during the commission of a dangerous felony, two counts of unlawful possession of a firearm by a convicted felon, one count of aggravated stalking, two counts of vandalism, three counts of reckless endangerment, one count of theft, one count of burglary of a vehicle, one count of attempted second-degree murder, and one count of aggravated assault, for which he received an effective sentence of forty-one years in confinement.  On appeal, the defendant contends the evidence presented at trial was insufficient to support his conviction for aggravated assault.  The defendant also argues the trial court erred in denying his motion to sever, the trial court failed to give complete and accurate jury instructions, and improper argument by the State affected the verdict.  After reviewing the record and considering the applicable law, we remand the case to the trial court for entry of corrected judgment forms in counts five, eight, eleven, and fourteen.  In all other respects, we affirm the judgments of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgments**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and JILL BARTEE AYERS, J., joined.

Mark C. Hazlewood, Knoxville, Tennessee, for the appellant, Jomo Kenyatta Berry.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Charme Allen, District Attorney General; and Sean Roberts and Joseph Welker, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

***Facts and Procedural History***

This case relates to multiple shooting incidents between the defendant and the victim, Nicole Jones, on October 25, 2022, October 31, 2022, and December 15, 2022. For his actions, the defendant was charged with one count of attempted first-degree murder (count one), two counts of employing a firearm during the commission of a dangerous felony (counts two and twelve), two counts of unlawful possession of a firearm by a convicted felon (counts three and seventeen), one count of aggravated stalking (count four), two counts of vandalism (counts five and fourteen), two counts of reckless endangerment (counts six and thirteen), one count of theft of a firearm (count seven), one count of theft (count eight), one count of burglary of a vehicle (count nine), two counts of attempted second-degree murder (counts ten and eleven), and two counts of aggravated assault (counts fifteen and sixteen). The defendant subsequently filed a motion to sever the charges related to the October 31st incident, counts fifteen, sixteen, and seventeen. The trial court conducted a pre-trial hearing on November 21, 2023.

I.     *Motion for Severance*

In his motion for severance, the defendant argued that there was no common scheme or plan connecting the incidents and that evidence regarding counts fifteen, sixteen, and seventeen would not be admissible against the remaining counts. The State argued the offenses should remain mandatorily joined as the offense of aggravated stalking (count four) encompassed all three dates, or alternatively, that the offenses form a common scheme or plan and the evidence of one offense would be admissible in the trial of the others.

No evidence was presented at the hearing, and following argument, the trial court denied the defendant's motion, finding that the offenses

> are within the jurisdiction of a single court. That being said, when the [c]ourt also considers permissive joinder of offenses and that talks about under the rule that two or more offenses may be joined in the same indictment, presentment, or information with each offense stated in a separate count and then there are certain considerations if, one, the offenses constitute part of a common scheme or plan, or they are of same or similar character.
>
> So what we [have] here, obviously, what's been described to the [c]ourt is same or similar character. The [c]ourt does find that they are part of a continuing plan, common scheme or plan.

- 2 -

And really, even going further, that evidence of one would be admissible in the trial of the others, if the [c]ourt did conduct a 404(b) hearing and did – if these were separate charged documents – or charging instruments, I should say – and were proceeding to trial on one and the State intended to introduce proof of a different offense, pursuant to Rule 404(b), they would likely argue that the material issue that existed would be their identity, motive, plan which deals with the common scheme or plan, or a lack of mistake.

And the [c]ourt would certainly weigh that and have to find the proof by clear and convincing evidence, but certainly that – the probative value of those alleged offenses that occurred independently from the charged offense would certainly be something that the [c]ourt would have to consider with regard to the prejudicial effect.

The unique similarities that is contemplated, this is a case that involved shooting at the same victim on several different occasions. So that the [c]ourt does find that that is unique, obviously. You're targeting the same one victim and also putting others in danger as well. I think there's several victims listed in several counts of this indictment.

So the signature, obviously, of this particular continuing criminal episode would be the intent or motive to shoot the person. So I do think that the offenses were properly joined pursuant to Rule 8(b)(1), and when the [c]ourt did consider argument pursuant to Rule 14 dealing with severance, particularly severance of permissively joined offenses, the [c]ourt does find that they are part of a continuing scheme or plan to ultimately achieve his goal of shooting this victim in this case.

The defendant then proceeded to trial.

## II.     Trial

The evidence presented at trial showed that in September 2022, the victim ended a two-year relationship with the defendant. However, the victim and the defendant remained friends, and the victim agreed to watch the defendant's dog while the defendant obtained his CDL license. On October 25, 2022, as the victim and her new boyfriend, Averly Lake, walked the dog near the victim's apartment building, the defendant ran out from behind a dumpster carrying a black and green gun. The defendant did not speak as he pointed the

- 3 -

gun at the victim and Mr. Lake, and they immediately ran back into their apartment and called 911.

On the evening of October 31, 2022, when the victim and Mr. Lake took the dog for a walk, they discovered a Chick-fil-a bag, a drink, and a dog bone outside the door to their apartment. On the windshield of the victim's car, they found a romantic greeting card that the victim had given the defendant when they were together. The victim and Mr. Lake continued walking and observed the defendant behind a dumpster. The defendant "was just poking out and then he ran out with the gun, just running down the sidewalk." When the victim saw the defendant's gun and heard several gunshots, she and Mr. Lake "turned around and started running back." The victim was "confused" during the altercation and "didn't know why and what was going on. . . . It was just so much running through [her] head." Once inside her apartment, the victim immediately called 911 and waited for police to arrive.

Officer Nathan Zirges, previously with the Knoxville Police Department ("KPD"), responded to a shots fired call at the apartment complex and spoke with several witnesses, including the victim and Mr. Lake. According to Officer Zirges, Mr. Lake appeared "a little frantic and flustered at the situation." He was "constantly pacing back and forth." The victim was "concerned about the incident" and "wanted to make sure that she was as helpful as she could be in giving [them] all the information."

Officer Stephen Mercado with the KPD processed the scene, collecting three .40 caliber Smith and Wesson shell casings and a firearm magazine containing eleven .40 caliber Smith and Wesson unfired rounds.

On December 15, 2022, the victim arrived home from work at 9:00 a.m. and observed the defendant standing next to a "brownish" truck. He approached the victim's vehicle and demanded that she return his dog. The victim refused and told the defendant to leave because she had an order of protection against him. The defendant "got mad" and began firing the same gun the victim had seen during the prior incidents. The victim ran into her apartment and called 911. The victim could hear "shots like on the metal, like the door." According to the victim, all the apartments in the building were occupied by tenants at the time of the shooting.

Officer Charles Sands with the KPD responded to the scene and observed two vehicles in front of the victim's building with multiple bullet holes as well as bullet defects around the door of the victim's apartment building. Officer Sands spoke to several witnesses, who stated that the shooter was in a gray or silver truck and fired several shots toward the victim's apartment building. When Officer Sands spoke to the victim, she

- 4 -

appeared "pretty shaken" and presented a copy of the order of protection against the defendant.

Officer Rachel Warren with the KPD's forensic unit processed the scene. According to Officer Warren, the victim's vehicle had two bullet defects on the driver's side as well as two bullet defects on the trunk. The vehicle that was parked next to the victim also had two bullet defects on the driver's side. Officer Warren collected two .40 caliber casings from underneath a nearby vehicle, a bullet fragment from the sidewalk, and a bullet from the victim's trunk.

After the police left the scene, the victim was unable to sleep because she "didn't know why this was happening. . . So [she] was a mess." At 11:30 p.m., as the victim was driving to work on Interstate 40, she began to hear gunshots. The victim pulled onto the shoulder near the Rutledge Pike exit and observed a truck drive past her. As she exited the interstate to search for help, the victim saw the same truck make a U-turn and begin to follow her. When she looked in her rearview mirror, she realized the defendant was driving the truck, so she quickly pulled into a Casey's gas station, ran inside, and told the worker that "someone was trying to kill [her]." Ella White, who was working the cash register, took the victim into the back of the store, where Paige Turner was locking up at the end of her shift. Ms. Turner decided that the safest place to hide was the cigarette room, a stockroom that could only be accessed with a key. The three women went into the stockroom, and Ms. Turner called 911. Initially, Ms. Turner heard the defendant's footsteps outside the stockroom. However, she eventually opened the door and observed the defendant outside the gas station with a gun in his hand. When the defendant drove away approximately ten minutes later, the women left the stockroom and waited for the police to arrive. Upon examining her vehicle, the victim noticed that her lunch bag and purse, which contained a 9mm handgun, were missing.

Kalob Hancock was parked at Casey's, preparing for his nightly paper route, when he observed the victim quickly pull into the parking lot and run into the store. The victim's car was still running, so Mr. Hancock initially believed the victim had to use the restroom. However, a few moments later, the defendant drove up, walked over to the victim's vehicle, and entered the store. When the defendant exited the store, Mr. Hancock noticed that he had a handgun in his right hand. Mr. Hancock waited for the defendant to reenter the store and then drove to a nearby funeral home, where he called 911. As he waited for the police, Mr. Hancock heard a vehicle "zoom[] right past [him]." Although he did not see it, it sounded like the same truck that had followed the victim to Casey's.

Officer AJ Scott responded to a shooting in progress call at the Casey's on Rutledge Pike. Upon arriving, Officer Scott observed the victim, who "appeared to be in shock." After speaking with the victim for several minutes, it was apparent that she "underwent

some sort of significant trauma and was trying to regain her sense of self." The victim's car window was shattered, and Officer Scott noted the vehicle was "riddled with bullet holes."

Officer LeAnn Bruce, a crime scene technician with the KPD, processed the victim's vehicle. Officer Bruce discovered multiple bullet holes on the outside of the rear driver's side door and the trunk. Officer Bruce also recovered metal shards from inside the rear driver's side door panel.

Detective Patricia Tipton with the KPD's Special Crimes Unit responded to Casey's and collected surveillance footage from the shooting. Upon reviewing the surveillance footage, Detective Tipton requested that a bulletin be issued for the defendant and, due to the defendant's family connections in Texas, alerted law enforcement authorities in the Dallas area.

Investigator Reid Golson with the Collin County Texas Sheriff's Office received information that the defendant had an active felony warrant and was staying with his brother in McKinney, Texas. Investigator Golson and his team set up surveillance around the defendant's brother's house and apprehended the defendant without incident on December 21, 2022.

Lieutenant Brian Dalton, an expert in tool mark and firearms examination and shooting incident reconstruction with the KPD, examined the three casings, eleven cartridges, and firearm magazine recovered on October 31st and the two casings, bullet fragment, and bullet recovered on the morning of December 15th. Lieutenant Dalton concluded that the three casings from October 31st and two casings from December 15th were fired from the same .40 caliber firearm. Tests of the bullet fragment and .40 caliber bullet were inconclusive as to whether they were fired from the same firearm as the casings. On cross-examination, Lieutenant Dalton agreed that he also examined a 9mm damaged projectile from the morning of December 15th that was not consistent with the other rounds recovered from the scene.

Special Agent Tatiana Cochrane, an expert in forensic biology with the Tennessee Bureau of Investigation, analyzed swabs taken from bullets and a firearm magazine as well as oral swabs from the victim and the defendant. Because there was a limited amount of DNA on the items, Agent Cochrane performed additional Y-STR testing, which detects only male DNA. However, further testing concluded that there was "not enough DNA to make a comparison" to the defendant's sample.

On cross-examination, Officer Zirges agreed that he did not hear the 911 calls on the night of October 31, 2022, and that the information in the calls was not relayed to him.

When asked whether he investigated whether there may have been a second shooter, Officer Zirges testified that he "looked around the area to see if there were any other shell casings or a possible, another possible shooting location. Didn't find any." On redirect examination, Officer Zirges agreed that he spoke with Mr. Lake about whether he owned a gun, and Mr. Lake stated that "if [he] had one, [he] would have used it."

On cross-examination, Officer Sands testified that the information from the 911 calls was not relayed to him before his arrival on the scene. He agreed that Mr. Lake's outfit on the morning of the shooting was similar to the description of the shooter in the 911 call but stated that the caller said the shooter was wearing tan pants, and Mr. Lake was wearing gray pants. On redirect examination, Officer Sands testified that he did not find any evidence that a second shooter was present and agreed that Mr. Lake remained on the scene following the shooting and that no firearm was discovered on him.

On cross-examination, the victim testified that the defendant gave her the dog in late September 2022 and denied receiving the dog on October 25th or telling officers that the defendant had dropped the dog off that day. The victim agreed that she took photographs of the items left on her doorstep and windshield on October 31st but stated that she did not turn them over to the police and threw the items away before the police arrived. She acknowledged testifying at the preliminary hearing that she did not see the defendant with a gun on the morning of December 15th but stated that she "[saw] him with [her] own two eyes." The victim also agreed that at the preliminary hearing she testified that she did not see who shot at her on the evening of December 15th.

A stipulation of fact was entered into proof which stated the following:

The parties stipulate that the defendant, Jomo Kenyatta Berry, had been convicted of a felony offense prior to the year 2022 which prohibited Jomo Berry from lawfully possessing a firearm in October of 2022 and December of 2022.

The defendant elected not to offer any proof and moved for a judgment of acquittal, which was granted, in part, dismissing count sixteen of the indictment. The defendant was subsequently found guilty of one count of attempted first-degree murder (count one), two counts of employing a firearm during the commission of a dangerous felony (counts two and twelve), two counts of unlawful possession of a firearm by a convicted felon (counts three and seventeen), one count of aggravated stalking (count four), two counts of vandalism (counts five and fourteen), three counts of reckless endangerment (counts six, eleven and thirteen), one count of theft (count eight), one count of burglary of a vehicle (count nine), one count of second-degree murder (count ten), and one count of aggravated

- 7 -

assault (count fifteen). The defendant was acquitted on count seven. The trial court subsequently imposed an effective sentence of forty-one years in confinement.

The defendant filed a motion for new trial which the trial court denied. This timely appeal followed.

*Analysis*

On appeal, the defendant contends the evidence presented at trial was insufficient to support his aggravated assault conviction.[1] The defendant also argues the trial court erred in denying his motion for severance, the trial court gave incomplete and inaccurate jury instructions, and improper argument by the State affected the verdict. The State contends the evidence is sufficient, the trial court properly denied the motion for severance and instructed the jury, and the State's closing argument was proper.

## I.    Denial of Motion for Severance

The defendant argues the trial court erred in denying his motion for severance. The defendant contends there was no common scheme or plan connecting the December and October offenses. The State submits the trial court acted within its discretion in denying the motion for severance.

Two or more offenses may be joined in the same indictment if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character. Tenn. R. Crim. P. 8(b)(1), (2). However, "the defendant has the right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible in the trial of the others." Tenn. R. Crim. P. 14(b)(1). A trial court's decision to consolidate or sever offenses pursuant to Rule 8(b) and Rule 14(b)(1) is reviewed for an abuse of discretion. *State v. Eady*, 685 S.W.3d 689, 709 (Tenn. 2024). "An abuse of discretion in this context implies that the trial court applied an incorrect legal standard or reached a decision against logic or reasoning which caused an injustice to the complaining party." *State v. Denton*, 149 S.W.3d 1, 12 (Tenn. 2004). A defendant has the burden of showing that he was "clearly prejudiced" by the trial court's denial of a motion to sever the offenses. *State v. Hall*, 976 S.W.2d 121, 146 (Tenn. 1998).

In examining a trial court's ruling on a severance motion, the primary consideration is whether the evidence of one offense would be admissible in the trial of another if the

---

[1] The defendant does not challenge his convictions for attempted first-degree murder, employing a firearm during the commission of a dangerous felony, unlawful possession of a firearm by a convicted felon, aggravated stalking, vandalism, reckless endangerment, theft, burglary of a vehicle, and attempted second-degree murder.

offenses remained severed. *Spicer v. State*, 12 S.W.3d 438, 445 (Tenn. 2000). Essentially, "any question as to whether offenses should be tried separately pursuant to Rule 14(b)(1) is 'really a question of evidentiary relevance.'" *Id.* (quoting *State v. Moore*, 6 S.W.3d 235, 239 (Tenn. 1999)). As such, the trial court must determine from the evidence presented that

> (1) the multiple offenses constitute parts of a common scheme or plan; (2) evidence of [one] offense is relevant to some material issue in the trial of all the other offenses; and (3) the probative value of the evidence is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant.

*State v. Garrett*, 331 S.W.3d 392, 403 (Tenn. 2011) (quoting *Spicer*, 12 S.W.3d 438, 445 (Tenn. 2000)) (citations omitted).

Our supreme court has recognized that "a common scheme or plan for severance purposes is the same as a common scheme or plan for evidentiary purposes." *Moore*, 6 S.W.3d at 240 n.7. Common scheme or plan evidence tends to fall into one of three categories:

> (1) offenses that reveal a distinctive design or are so similar as to constitute "signature" crimes; (2) offenses that are part of a larger, continuing plan or conspiracy; and (3) offenses that are all part of the same criminal transaction.

*Id.* at 240. A larger, continuing plan or conspiracy relates to "crimes committed in furtherance of a plan that has a readily distinguishable goal, not simply a string of similar offenses." *Denton*, 149 S.W.3d at 15. This category "encompasses groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). The evidence sought is "of a working plan, operating towards the future with such force as to make probable the crime for which the defendant is on trial." *State v. Massey*, No. E2013-01047-CCA-R3-CD, 2014 WL 3661490, at *31 (Tenn. Crim. App. July 23, 2014) (quoting *State v. Harris*, No. M2004-00049-CCA-R3-CD, 2005 WL 2255488, at *7 (Tenn. Crim. App. Aug. 23, 2005). Where the State has not established evidence of a "'working plan' whereby the subsequent offenses are predictable or probable from the defendant's determination to commit the initial offenses (or vice versa)," the subsequent offenses cannot constitute parts of a larger, continuing plan. *Id.*

No proof was presented at the hearing, only the arguments of counsel. The State listed the defendant's offenses and argued that they should be mandatorily joined because the defendant's aggravated stalking charge was, by definition, "a continuous unconsented

contact" that covered all three dates. The trial court disagreed that the offenses should be mandatorily joined, finding that "this is not based on the same conduct arising from the same criminal episode." Instead, the court ruled that the offenses constituted part of a common scheme or plan and that evidence of one offense would be admissible at the trial of the others.

The defendant argues, and we agree, that the State "presented no proof at the motion to sever [hearing] for the trial court to base its decision on." Our review of the denial of the defendant's severance motion is confined to the evidence and arguments presented at the severance hearing. *See Spicer*, 12 S.W.3d at 445. Because the State failed to show via evidence and arguments that the offenses should remain joined, and because, absent such a showing, the defendant had a right to have the permissively joined offenses severed, the trial court erred by denying the defendant's severance motion.

Having determined that the trial court erred by refusing to sever the offenses, we must determine whether the error was harmless. *Garrett*, 331 S.W.3d at 405 (citing *Spicer*, 12 S.W.3d at 447). "In making this determination, we consider the whole record and focus on the 'impact the error may reasonably be taken to have had on the jury's decision-making.'" *Id.* (quoting *State v. Rodriguez*, 254 S.W.3d 361, 372 (Tenn. 2008)).

> In this regard, "'the line between harmless and prejudicial error is in direct proportion to the degree . . . by which [the] proof exceeds the standard to convict. . . .'" *Spicer*, 12 S.W.3d at 447 (quoting *Delk v. State*, 590 S.W.2d 435, 442 (Tenn. 1979)). "The more the proof exceeds that which is necessary to support a finding of guilt beyond a reasonable doubt, the less likely it becomes that an error affirmatively affected the outcome of the trial on its merits.'" *Toliver*, 117 S.W.3d at 231 (quoting *State v. Gilliland*, 22 S.W.3d 266, 274 (Tenn. 2000)). Nevertheless, we must remain focused not simply on the weight of the evidence, but on 'the actual basis for the jury's verdict.' *Rodriguez*, 254 S.W.3d at 372.

*Id.*

Here, not only was the evidence of the defendant's guilt of each of the offenses overwhelming, but it is clear from the proof adduced at trial that, if severed, evidence of the October and December incidents would be admissible at the trial of the other to prove identity, motive, and lack of mistake. Accordingly, the trial court's refusal to sever the offenses was harmless, and the defendant is not entitled to relief on this issue.

## II.     Sufficiency

The defendant contends the evidence is insufficient to support his conviction for aggravated assault.  Specifically, the defendant argues the State failed to establish that the victim feared imminent bodily injury because of the defendant's use or display of a firearm.  The State responds that the evidence is sufficient.

A jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the defendant carries the burden of demonstrating to this Court why the evidence will not support the jury's findings.  *See State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).  The defendant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).  "The standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction."  *State v. Thompson*, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000).  Moreover, "once the trial court approves the verdict as the thirteenth juror and imposes judgment," our appellate review is limited to determining the sufficiency of the evidence.  *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993); *see* Tenn. R. Crim. P. 33(d).

As charged in this case, aggravated assault occurs when a person intentionally or knowingly causes another to reasonably fear imminent bodily injury by using or displaying a deadly weapon.  Tenn. Code Ann. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii).  The defendant contends the evidence presented was insufficient to establish that the victim "reasonably fear[ed] imminent bodily injury" because she testified that she was "confused" and not frightened during the shooting on October 31, 2022.

Although the victim did not directly testify that she was in fear during the shooting, the jury was entitled to infer from the proof presented, including the victim's testimony, the victim's fear of imminent bodily injury. *See State v. Williams*, No. E2014-01076-CCA-R3-CD, 2015 WL 5023136, at *7 (Tenn. Crim. App. Aug. 25, 2015), *perm. app. denied* (Tenn. Jan. 15, 2016) (holding the jury was entitled to infer fearfulness when the victims ran away from the shooter); *State v. Brewer*, No. W2012-02282-CCA-R3-CD, 2014 WL 1669807, at *23 (Tenn. Crim. App. Apr. 24, 2014), *perm. app. denied* (Tenn. Sept. 18, 2014) (holding the evidence was sufficient even though the victim did not testify he was fearful); *State v. Smith*, No. W2011-02122-CCA-R3-CD, 2013 WL 6388588, at *14 (Tenn. Crim. App. Dec. 5, 2013), *no perm. app. filed* (holding the evidence was sufficient to find the victims were fearful of imminent bodily injury when they showed a worry about self-preservation); *State v. Whitfield*, No. 02CO1-9706-CR-00226, 1998 WL 227776, at *2 (Tenn. Crim. App. May 8, 1998), *perm. app. denied* (Tenn. Dec. 7, 1998) ("The element of 'fear' is satisfied if the circumstances of the incident, within reason and common experience, are of such a nature as to cause a person to reasonably fear imminent bodily injury.").

When viewing the evidence in a light most favorable to the State, the proof shows that the victim and Mr. Lake were walking the defendant's dog when the defendant jumped out from behind a dumpster holding a gun. The defendant began shooting toward the victim, and the victim and Mr. Lake "turned around and started running back" to their apartment. The victim was "confused" because she "didn't know why and what was going on . . . It was just so much running through [her] head." After returning to her apartment, the victim immediately called 911 and waited for police to arrive. Under those circumstances and based on the victim's statements, the jury could have inferred the victim was in fear of imminent bodily harm. The defendant is not entitled to relief on this issue.

## III.    Jury Instructions

The defendant contends the jury instructions on attempted second-degree murder and voluntary manslaughter were incomplete because they cross-referenced the definition of "criminal attempt" provided earlier in the instruction and, thus, omitted an essential element of the offenses. The State responds that the issue is waived because the defendant failed to raise it in a timely manner during the trial. Alternatively, the State submits that the trial court properly and succinctly instructed the jury.

A party must contemporaneously object to incomplete jury instructions to preserve the issue for plenary appellate review. *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). And a party challenging erroneous or inaccurate jury instructions must at least raise the issue in the motion for new trial. *Id.*; *see also* Tenn. R. Crim. P. 30(b); Tenn. R. App. P.

(3)(e). Otherwise, this Court may only review the issue for plain error. *See Faulkner*, 154 S.W.3d at 58; Tenn. R. App. P. 36(a), (b).

Here, the defendant's argument appears to be that the trial court provided an incomplete instruction. The defendant did not contemporaneously object to the trial court's jury instructions on attempted second-degree murder and voluntary manslaughter, nor did he request a special jury instruction. Because the defendant failed to raise the incomplete jury instruction during trial, he has waived plenary review of that issue on appeal. *See Faulkner*, 154 S.W.3d at 58. Moreover, because the defendant has not requested plain error review, we decline to conduct that analysis *sua sponte*. *See State v. Ruiz*, 716 S.W.3d 439, 453 (Tenn. Crim. App. 2024). The defendant is not entitled to relief on this issue.

## IV. Improper Argument

The defendant argues the prosecutor made an improper comment during closing argument when he made an improper appeal to the jury's emotions. The State contends the closing argument was proper.

During the State's closing argument, the following exchange occurred:

Prosecutor: And so I submit to you that you have everything that you need to render a conviction on all 17 counts. And that's what we as the State of Tennessee, that's what we ask that you do. Because Nicole Jones should not have to wait until she's killed for someone to care, and we're just asking that you care.

Trial Court: All right. Thank you, General. Mr. Hazlewood, you're recognized for closing argument, sir.

Defense Counsel: May we approach?

Trial Court: Sure.

(Whereupon, a bench conference was held on the record in the presence of the jury, but out of the hearing of the jury and the following proceedings were had)

Defense Counsel: I don't believe – that was an improper appeal to the jury's emotions there at the end, Your Honor.

- 13 -

Trial Court: Statements of attorneys are not evidence. So I don't think it was necessarily improper.

Defense Counsel: I just wanted the objection on the record.

Trial Court: Sure. All right. That'll be preserved for the record.

Defense Counsel: Thank you.

Closing arguments are an important tool during trial, so attorneys are given a wide-range of autonomy when making them, and the trial court has a wide-range of discretion when controlling them. *See State v. Carruthers*, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). It is possible for five general areas of prosecutorial misconduct to occur during closing arguments:

> (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge.

*Id*. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." *State v. Pulliam*, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

While the defendant objected to the State's closing argument, he never requested the trial court provide a curative instruction or other remedy in response to the State's argument. A trial court should provide a curative instruction once an objection to improper argument is made. *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997), *abrogated on other grounds by State v. Thomas*, 687 S.W.3d 223 (Tenn. 2024). However, if the trial court fails to give a curative instruction *sua sponte*, then counsel for the party has the obligation to request the trial court to provide a curative instruction. *Id*. If the party fails to request a curative instruction, or is dissatisfied with the instruction and fails to request a more complete instruction, then the party waives this issue for appellate purposes. *Id*. Because the defendant never asked the trial court for a curative instruction or other remedy in response to the State's argument, he has waived this issue. *See* Tenn. R. App.

P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *State v. Bell*, No. M2019-01810-CCA-R3-CD, 2021 WL 794771, at *6 (Tenn. Crim. App. Mar. 2, 2021) (reiterating that when a defendant fails to ask for a curative instruction, he waives the issue on appeal). As such, this issue is waived. While this Court may consider an otherwise waived issue for plain error, the defendant has not asked for plain error nor do we conclude that the application of the plain error doctrine is appropriate. Tenn. R. App. P. 13(b); *State v. Adkisson*, 899 S.W.2d 626, 638-39 (Tenn. Crim. App. 1994). The defendant is not entitled to relief on this issue.

## V.  Corrected Judgment Forms

Finally, while we affirm the judgments of the trial court, remand is necessary to correct clerical errors in the uniform judgment documents to accurately reflect the misdemeanor minimum service percentage in counts five, eight, eleven, and fourteen. Tennessee Rule of Criminal Procedure 36 provides that "the court may at any time correct clerical mistakes in judgments, orders, or other parts of the record, and errors in the record arising from oversight or omission." Corrected judgment forms should be entered for counts five, eight, eleven, and fourteen, noting a 75% minimum service percentage.

### *Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed. However, we remand this case for entry of corrected judgments as specified in this opinion.

s/ *J. ROSS DYER*
J. ROSS DYER, JUDGE

- 15 -